No. 65.—WILLIAM P. HALL and *others*, plaintiffs in error, *vs·* FARISH CARTER and MICHAEL J. KENAN, executors, &c. defendants in error.

[1.] An executor is not, ordinarily, liable for *assets* which come to the hands of his co-executor, or responsible for his *devastavit.* If he is, however, active in the matter, and by his action, whether intentionally or not, enables his co-executor to commit a *devastavit*, he will be liable with him for it. Each executor has power, under the will, to execute it, and one has no power to prevent the other from taking possession of *assets*, or to take them out of his possession after he has acquired the possession.

[2.] An inventory of notes and other *choses in action* is not, of itself, evidence of *assets* in hand, to charge an executor, but he will be liable for a *devastavit*, if he fails to collect such as are collectable, with due care and proper diligence.

[3.] If two or more executors join in a receipt for money, they are, by weight of authority in England, thereby jointly liable. Query as to this rule in the United States.

[4.] A distinction taken between a joint receipt and a joint return of an inventory.

[5.] An inventory of *choses in action*, is a requirement of law, obligatory upon all the executors who qualify. It does not, of itself, show *assets* in the hands of either, so as to charge them, nor does it show a joint possession of the evidences of debt, but leaves the fact of actual possession and control, in any one or all, open to proof.

[6.] *Held*, therefore, that where there is a joint return of the inventory of debts, and the possession is in one, and he through negligence, without participation by the other, fails to collect them, he is solely liable for such *devastavit.*

Exceptions to an award, in Baldwin Superior Court. Decided by Judge JOHNSON, February Term, 1850.

The plaintiffs in error, as legatees under the will of George W. Murray, deceased, filed a bill against Farish Carter and Michael J. Kenan, the executors thereof, for an account and settlement. This cause, under a rule of the Court, was referred to the arbitrament of counsel named, by which rule the arbitrators, on request of either party, were required to reduce to writing any decision they might make upon any question of law; which decision might, by either party, be submitted to the judgment of the

Hall and others *vs.* Carter and Kenan.

Judge of the Superior Court, with leave to proseeute a writ of error thereto.

The arbitrators awarded against Michael J. Kenan, one of the executors, the sum of $9,695 10, for *choses in action*, good and eollectable at the death of testator, and lost by negligence and failure to collect, and not accouuted for in his returns.

Under the rule, the arbitrators returned, in writing, their decision, that both the executors were not liable for this amount, but Kenan alone was liable. They farther returned, that the only evidence on which they made their decision, except that to be found in the pleadings and exhibits, was, that the *choses in action* were produced by Mr. Kenan, on the hearing before the arbitra-tors, as having been in his possession from the time of taking the inventory. The inventory was made jointly by the executors.

Kenan, by his answer, stated that he had the exclusive custody of the assets—the subject matter of this dispute—from the time of the making of the inventory, down to the time of the making of the award ; and that the only assets in the hands of Carter, were turned over to him by Kenan.

Carter, in his answer, stated the same facts, and the manner in which he became possessed of any of the assets ; also, that he knew nothing of the management of Kenan, except what he de-rived from his return.

On the motion to make the award the judgment of the Court, the plaintiffs in error excepted to this decision, on the ground that both executors were liable, jointly, for the amount thus charged against Kenan, individually.

The Court overruled the objection, and this decision is assign-ed as error.

Cone, counsel for plaintiffs in error, submitted the following—

1st. Executors are liable for the amount of inventories return-ed by them ; and if they return none of the debts due the estate, as desperate or doubtful, they shall be charged with the whole as assets. *Graham vs. Davidson*, 2 *Dev. & Batt.* 155. *Wright vs. Wright*, 2 *McCord's Ch.* 196.

2d. If, by an agreement between two executors, one is to re-ceive and intermeddle with such part of the estate, and another with such a part, each shall be answerable for the whole. *Monell*

*vs. Monell,* 5 *Johns. Ch.* 294.   *Ram. on Legal Assets, ch.* 38, §14, *pp.* 542, 544, 558.   2 *Williams on Executors,* 1119.

3d.  Executors joining in receipts, are responsible, jointly, for the whole.   *Johnson vs. Johnson,* 2 *Hill's Ch.* 277.   *Leigh vs. Barry,* 3 *Atkyns,* 583, 584.   2 *Story's Eq.* §§1280, 1281.

4th.  The main and important point—where two or more executors qualify, and the *choses in action* belonging to the estate are lost by negligence and failure to collect, the executors are all jointly responsible for the amount so lost by negligence and failure to collect.   *Chambers vs. Manchin,* 7 *Vesey,* 198.   *Brice vs. Stokes,* 11 *Vesey,* 325.   *Muckloe vs. Tuller,* 1 *Jacobs,* 198.   *Stiles vs. Guy, Law Mag.* 281.   *Booth vs. Booth,* 1 *Beavan,* 125.   *Doyle vs. Blake,* 2 *Schoales & Lefr.* 244.   *Clark vs. Clark,* 8 *Paige,* 159.   *Scully vs. Delany,* 2 *Irish Eq.* 165, *cited* 4 *Bar. & Harr. Dig.* 197.   *Robinson vs. Harris,* 1 *Hayes & Jones,* 412, *cited* 4 *Bar. & Harr. Dig.* 194.   *Williams vs. Maitland,* 1 *Iredell's Equity,* 92.

McDONALD, for defendants, submitted—

Joint inventory returned by executors, is not evidence of joint possession of the assets.  24 *Com. Law Rep.* 133.  2 *Williams' Executors,* 1404.  *Ochiltree vs. Wright,* 1 *Dev. & Bat. Eq. Rep.* 336.  *Southerland vs. Brush,* 7 *John. Ch. Rep.* 22.

A *devastavit* by one executor does not charge his companion. *Cameron et al. vs. The Justices, &c.* 1 *Kelly's Rep.* 36.  2 *Williams' Executors,* 1291.  1 *Peer Wms.* 81, *last note.  Churchill et al. Ib.* 241 *and note.*  2 *Vesey, Jr.* 678, *last note.*  4 *Eq. Rep.* 71, 76.  *Ib.* 92.

Negligence in collecting the assets is a *devastavit.*  2 *Wms. Executors,* 1284.

The actual possession and use, by one of two executors, is not, in law, the possession and use of both, so as to attach a liability on both.  2 *Wms. Exrs.* 685.

One executor has no authority to take from the possession of another, the assets of the testator, and cannot, therefore, be made liable for the default of that other.  1 *Dev. & Bat. Eq. R.* 336.

Executors stand on the same footing, having equal rights and the same responsibilities, are not liable to each other, and each is

liable to the *cestui que trust*, to the extent of the fund he receives, 14 *Peters' Rep.* 169.   11 *Johns. Rep.* 21.

One executor not liable for the *laches* of another, in not enforcing the collection of debts.   2 *Dev. Eq. Rep.* 51.

One executor not liable for the breach of trust of another, except in cases where the will creates an express trust, and he knew and acquiseces in the breach of trust.   *Williams vs. Nixon,* 2 *Beavan,* 472.

Executors and administrators are liable in Georgia, under the Statute and Common Law of England, as it existed in 1764, *Hotchkiss,* 476,

*By the Court.*—NISBET, J. delivering the opinion.

The Circuit Judge confirmed the award of the arbitrators, and from his judgment a writ of error is taken.   The arbitrators held, as an inference of law, from the facts before them, that the executors of Murray, (Carter and Kenan,) are not jointly liable for the nine thousand dollars and upward, of *choses in action,* not collected, but that Kenan alone is liable.   Whether their judgment of the law upon the facts be right, is the question for our determination.   It is first important to state, definitely, what those facts are ; for it will be seen that the rule of legal liability,in cases like this, depends upon slight variation in the facts.   The bill of exceptions states, that no evidence was before the arbitrators, but that which is afforded in the pleadings and exhibits, except that the *choses in action,* for the failure to collect which Kenan was made liable, *were produced to the arbitrators by Kenan, as having been in his possession from the date of the inventory.*   We are, therefore, to look to the pleadings and exhibits alone, for the facts, upon which the award was made, except the fact that Kenan produced the *choses in action,* and the farther fact, that they were produced by him as *having been in his possession from the date of the inventory.*

They are as follows: Carter and Kenan both qualified as executors to the will of George W. Murray.   They jointly returned to the Ordinary an inventory of bonds, notes and other evidences of debt due the estate, among which, and constituting a part of which inventory, were the notes, &c. making up the amount of $9,695 10, to the payment of which Kenan alone was found lia-

ble. These notes, &c. were proven before the arbitrators to have been collectable with reasonable diligence. They were exhibited to the arbitrators as wholly insolvent at the time of the award, and recognized by them as insolvent at that time. A part of the *choses in action* embraced in the inventory, as appears by Carter's answer and his returns, came into his possession, and he administered them, but no part of those upon which the award makes Kenan solely liable. The bill charges, generally, that the effects of the estate came into the possession of the two executors. In his answer responsive to the bill, Carter states, that the assets did not all come into his possession, nor did all come into the possession of his co-executor, Kenan, nor did all come into the possession of both jointly. It states farther, that such as came into his possession, he got from his co-executor, Kenan, or were attorney's receipts for papers placed with them for collection by the testator in his life, or by Kenan, after his death ; and Col. Carter, in his answer, refers to his returns, as exhibiting the character and extent of his administration. Those returns were irregularly made, and do not show that any of the *choses in action* upon which Kenan was made liable, came into his possession. Kenan's returns are also irregularly made, and exhibit no action whatever upon those *choses in action*. Carter denies in his answer, any knowledge on his part of the manner in which Kenan managed the assets in his hands, except what he derived from Kenan's returns. In his answer, Kenan states, that the notes, &c. upon which the award charges him, were insolvent, and that they had been in his possession from the time of the inventory. Upon these facts, the arbitrators determined that Kenan alone was liable for *choses in action*, embraced in the joint return of the inventory, which were collectable, but which were not collected. The plaintiffs in error, excepting to the judgment of the Circuit Court, affirming the award of the arbitrators in this regard, insist that both the executors are liable. Before entering upon the question, it is proper to state farther, that the complainants claim as residuary legatees under the will of Murray, and that in relation to their interests in the estate, there is no special trust devolved upon the executors. The will appoints them, in the usual form, executors, and directs that the property not specifically bequeathed be sold, and the proceeds " be paid to them as fast as the

estate is settled." The trust clearly is no more than the ordinary trust devolved upon executors to a will.

[1.] An executor is not, *under ordinary circumstances*, responsible for assets which come to the hands of his co-executor. The trust created by the will is a several trust. The confidence reposed by the testator is several. One is as much entitled to execute the will, in the absence of any special trusts or specific directions, as the other; nor can one deny to the other participation in the administration of the estate. Legal capacity to execute is devolved upon each. From these propositions, the rule results, that one of two or more executors is not responsible for the *devastavit* of his co-executor. This is generally true; but if he intentionally or otherwise has contributed to the *devastavit*, he will be responsible. If he is active in the matter, and by his action, whether with intention to commit a *devastavit* or not, enables his co-executor to commit it, he will be liable with him. "I take it to be clear, (says Lord *Thurlow*, in *Sadler vs. Hobbs*,) that where, by any act or any agreement of the one party, money gets into the hands of his companion, whether a co-trustee or co-executor, they shall both be answerable." 3 *Bro. Ch. C.* 116, *margin.*

The rule is stated with more latitude by Mr. *Williams*, as derived from the authorities, thus: "Where, by any act done by one executor, any part of the representative estate comes to the hands of his co-executor, the former will be answerable for the latter, in the same manner that he would have been for a stranger whom he had entrusted to receive it." *Williams on Executors, marg. p.* 1294. *Note to Churchill vs. Hobson,* 1 *P. Wms.* 241. 11 *Ves.* 335. *Hardr.* 314. *Dick. R.* 356. 1 *Rees & M.* 66. *Sterrit's Appeal,* 2 *Penn. R.* 419, 422. 2 *Hill's Ch. R.* 293. 4 *Rawl.* 157. 10 *Peters,* 532. 1 *P. Wms. R.* 81. 16 *Vesey,* 479, 480. 1 *Meriv.* 712. 1 *Sch. & Lefr.* 272. *Ib.* 341. *Monell vs. Monell,* 5 *Johns. Ch.* 294, '5, '6.

The counsel admits the general rule, that under ordinary circumstances, one co-executor is not bound for the *devastavit* of his colleague, and I do not understand him to lay down the rule of exception to that general rule any stronger or broader than I have stated it. He contends, however, upon different grounds, that according to the case made in this record, Carter is liable for the *devastavit* of Kenan; and first, he insists that "executors are liable for the amount of inventories returned by them, and if they

VOL. VIII. 50.

return none of the debts due to the estate as desperate or doubt-ful, they (both) shall be chargeable with the whole *as assets*."

[2.] The argument under this head, is drawn from the joint inventory returned by Kenan and Carter, and its weakness or strength depends upon the legal effect of the inventory. If it be true, that the joint inventory is, in law, an admission upon the re-cords of the Ordinary, of assets in the possession and control of both the executors, then it may be conceded, that a failure to col-lect in the collectable *choses in action* embraced in that inventory, is a joint *devastavit*, for which they are jointly liable. For, in that event, it would not relieve Carter, to show that the waste was the result of Kenan's neglect to collect, whilst he had the actual possession. If they are at first in the possession and control *of both*, each permits the sole possession and control of the other at his peril. In the prosecution of the argument, the learned coun-sel places this joint inventory upon the footing of a joint receipt for money, by two or more executors, and thus enlists in behalf of the conclusion to which he would conduct us, that large class of cases which have decided that co-executors are liable upon a joint receipt, when the loss of the money receipted for is the act of one only. The schedule of notes returned by a sole executor, with-out designating any part of it doubtful or desperate, was, at one time, evidence, *prima facie*, of liability for the whole; and he would be put upon the necessity of showing, if such were the fact, that any part of them was not collectable in the use of (to use the language of our Act of 1767) "due care and proper dil-igence." This is the rule as to an inventory of assets other than debts; and, as stated, such *was* the rule as to inventories of debts. 1 *Salk.* 296. *Buller's N. P.* 140. *S. C. Selwyn's N. P.* 779, *note, 6th edition.* 8 *Taunt.* 734. 3 *B. Moore*, 69. *Williams' Executors*, 1401.

In *Giles vs. Dyson*, (1 *Starkie's N. P. C.* 32,) Lord *Ellenbor-ough* would not allow an inventory of debts due to the estate, and which were not returned as desperate, to be considered as assets actually in the hands of the executor. His Lordship said, "you must prove, presumptively at least, that these debts have been paid—that presumption may depend upon time and other circum-stances. But upon the plea of *plene administravit*, it is necessary to prove that effects came to the hands of the defendant. This is the universal practice." I apprehend that it is now settled, that

although debts due to the testator are assets, yet the executor or administrator is not to be chargeable with them till he has received the money. *Williams on Executors*, 1187.   *Com. Dig. Assets*, *d. Bac. Ab. Exrs. h.* 1 *Camp*, 364. 1 *Salk.* 207. 14 *Johns. R.* 446. 4 *B. & Adol.* 657, *S. C.* 1 *Nev. & M.* 434.

The English doctrine seems to be this, that an inventory of property is *prima facie* evidence to charge an executor; and an inventory of *choses in action* is not even *prima facie* evidence to charge him, but the proof must go farther, and show, presumptively at least, that the money has been collected. Such is the legal effect of the inventory, as evidence of assets in the hands of the executor. His liability for a *devastavit*, in not collecting *choses in action*, I am not now examining—my purpose being, at present, to enquire what effect is to be given to an inventory, as evidence that assets have come to the hands of the executor. There seems to have been in England two kinds of inventories. Formerly, it was necessary to exhibit an inventory of the estate to be administered before probate of the will, according to the practice of the Prerogative Court of Canterbury; and this practice yet obtains in some country jurisdictions. The Statute, 21 *Henry VIII*, requires an inventory, yet it seems that according to the modern practice in England, neither executors nor administrators exhibit any inventory, unless cited for that purpose in the Spiritual Courts, at the instance of a party interested. 1 *Phellim*, 240. *Toller*, 250. *Williams' Exrs.* 707, '8. It is, however, prudent for the executor or administrator to exhibit an inventory for his own protection. 1 *Hagg.* 106. I refer to these things for the purpose of saying, that in England, the effect of an inventory, returned *before* probate, is different from the effect of an inventory since the *Statute of Henry VIII*, upon citation. It is less in the former than in the latter case. The object of the inventory *before* probate, was to show the estate to be administered, for the protection of the executor, as well as for the benefit of all persons interested in the estate. That is the object of the inventory required by our Statute, and our inventory, I have no doubt, answers to the inventory formerly required in England, before probate; whereas, the inventory now required of the executor in England, upon citation, has its counterpart here, in those annual returns or inventories of his actings and doings, which the executor is, by law, required to make. The rule of evidence, there-

fore, which is applicable to inventories here, is that which is in England applicable to inventories made before probate.   In *Stearne vs. Mills, Denman,* C. J. said, " I am of opinion, that the inventory, delivered by the executor, on proving the will, is not, in itself, evidence of assets having come to his hands."   4 *Barn. & Adol.* 655.   24 *Eng. Com. Law R.* 135.

The Statutes of Georgia, I believe, give no greater effect to the inventory of debts, than it has at Common Law.   They are, indeed, confirmatory of the position, that the return, simply, of an inventory and schedule of debts, is not, of itself, evidence that assets have come to the hands of the executor.   The Statute of 1764, by express words, makes the executor chargeable with " so much of the credits *only,* as he, she or they, *after due care and proper diligence, shall recover and receive,* in like manner as executors and administrators are made chargeable by the Common and Statute Law of England."   *Prince,* 222.

This Statute requires an inventory to be made " *of all and singular the rights and credits of the testator or intestate, whether the same be in ready money, judgments, bonds, or other specialties or notes of hand, together with a list or schedule of the books of account of such testator.*"   For the purpose of showing what is to be administered—for the protection of the executor, and doubtless, also for the benefit of creditors, heirs and distributees, this perfect inventory is to be exhibited, not before probate of the will, as in England, but within three months after qualification. But how is he to be charged ?   Why, only with so much as he shall *recover and receive,* after due care and proper diligence.   The law prescribes the rule of liability, as to choses in action—it ordains a criterion of liability; and that is *recovery and receipt,* after due care and proper diligence.   Now, the inventory, as evidence, can go no farther than the liability settled by the law.   It does not prove assets in hand—it does not prove *recovery* and *receipt*—it proves the receipt of the notes, bonds, book of accounts, &c. but not the money; and whilst, in one sense, they are assets, yet not assets in hand to charge the executor.   They are *evidences* of debts due, which may or may not be collectable.   By the Act of 1792, the inventory and appraisement of *property* is made evidence, but not conclusive, of the value of the estate.   That may be shown to be more or less than the appraisement. *Prin.* 226.

For the purposes of this opinion, it is sufficient, if I have dem-

onstrated that the inventory of a *sole* executor is not conclusive of assets in hand, and therefore, of liability. What then is the effect of a *joint* inventory, where there are two executors? Admit it to be the same against both that it has against one, when there is but one, then, as we have seen, it does not prove that the assets have actually come to hand, and the argument of counsel, that Carter is liable, because simply of the joint return, falls to the ground. The case does not stop with this joint return—far from it. But I have been endeavoring to meet the positions of the plaintiffs in error upon their own ground.

[3.] And I now enquire, what support the position taken by counsel on this joint inventory derives from its assumed analogy to a receipt signed by two executors. As to trustees, the rule is, that where they are authorized to receive money and jointly execute a receipt for it, they are, ordinarily, liable only for so much as each has received, and, ordinarily, it is different in case of executors. *Trustees* have equal interest and authority, and cannot act separately, as executors may, but must join in conveyances and receipts. They are obliged to join, for the sake of legal conformity. Justly, therefore, are they not liable, because of their joining. It is otherwise with executors.

They are not compellable to join in receipts. Each is competent to act. A receipt from one will be a valid discharge. If they join, therefore, in a receipt, it is a voluntary act, and is held an admission that they are jointly accountable. 2 *Fonbl. Eq. b.* 2, *ch.* 7, §5. *Fellows vs. Mitchell,* 1 *P. Williams,* 83, *note* 1. *Churchill vs. Hobson,* 1 *Ibid,* 241, *note* 1. *Leigh vs. Barry,* 3 *Atk.* 584. *Ambler,* 219. *Murrell vs. Cox,* 2 *Vern.* 570. *Prec. in Ch.* 173. *Moses vs. Levy,* 3 *Younge & Coll.* 359, 367. *Sadler vs. Hobbs,* 2 *Bro. C. R.* 114. 3 *Ibid,* 90. *Chambers vs. Minchin,* 7 *Vesey,* 198. *Brice vs. Stokes,* 11 *Vesey,* 324. *Joy vs. Campbell,* 1 *Sch. & Lef.* 341. *Doyle vs. Blake,* 2 *Ibid,* 242. *Hill on Trustees,* 312, 313. 2 *Story's Eq.* §§1280, 1281.

This rule, which charges *executors* upon a joint receipt, I concede, is established by the weight of authority in England; yet it has been questioned, and in fact modified there, by some of the ablest Judges of that empire. In *Churchill vs. Lady Hobson,* Lord *Harcourt* struggled against it. 1 *Pr. Wm.* 241. In *Westly vs. Clarke,* Lord *Northington* resisted it with convincing power. Among other things, he said, "If it appears plainly, that

one of the executors only received and discharged the estate indebted, and assigned the security, and others joined afterwards without any reason, and without being in capacity to control their co-executor, either before or after the act was done, what grounds has any Court, in conscience, to charge him? Equity arises out of a modification of acts, where a very minute circumstance may make a case equitable or iniquitous; and although former authorities may, and ought to bind the determination of subsequent cases, in respect to rights—as, in the right of courtesy or dower— yet there can be no rule for the future determination of this Court concerning the acts of men." 1 *Eden. R.* 357. See, also, the opinion of Lord *Alvanly,* in *Hovey vs. Blakeman,* (4 *Vesey,* 607, '8.) In *Monell vs. Monell,* a greater Chancellor than either of these, (*Kent,*) reasoned against it, and one not less than he, (*Story,*) after declaring that it seemed to him difficult to maintain the sound policy, or practical convenience, or intrinsic equity of the rule, expresses himself farther, thus: " Perhaps the truest exposition of the principle, which ought, in justice, to regulate every case of this sort—whether it be the case of executors, guardians or trustees—is that which has been adopted by a learned Equity Judge in our own country. It is, that if two executors, guardians or trustees, join in a receipt for trust money, it is *prima facie,* although not absolutely conclusive evidence that the money came to the hands of both; but either of them may show, by satisfactory proof, that his joining in the receipt was necessary, or merely formal, and that the money was, in fact, all received by his companion." 5 *Johns. Ch. Rep.* 296. *Story's Eq.* §§1281, 1282, 1283.

[4.] But is the inventory of *choses in action* of the same force and effect as a receipt? From what has been already said, it is manifest that it is not. As evidence, I have attempted to show, that of itself, it does not prove assets in hand; but a receipt is a written acknowledgment of the *receipt* of money—that very thing which our Statute requires to be proven, in order to charge an executor. The liability of two executors upon a joint receipt, goes upon the idea, that it is equivalent to an admission of their willingness to be jointly accountable. The inventory cannot be construed into any such admission. It is but an official statement that such and such bonds, notes, books of account, &c. are found among the papers of the testator, as belonging to his estate. If

it admits any thing, it only admits the possession of the *evidences of debts*, whereas, the receipt admits the possession of *money* collected upon those evidences of debt.

[5.] But the utter dissimilarity in the instruments, and in the legal operation of them, is palpably manifest in this.    The receipt is not required by law, but is voluntary ; whereas, the inventory is required by law, and demanded by the oath of the executor, and, therefore, is not voluntary:   The foundation upon which a joint liability upon a joint receipt rests, is, that the law does not require them to sign it jointly.   One can give a discharge, and if both do sign, it is because both choose to sign.   The cases which establish the rule admit, that in cases where a joint act is necessary by law, it does not apply—as in the case of the sale and transfer of property.   *Hill on Trustees*, 313.    *Terrell vs. Mathews*, 11 *Law Journ. N. S. Chanc.* 31.   *Hovey vs. Blakeman*, 4 *Vesey*, 608.   *Chambers vs. Minchin*, 7 *Vesey*, 197.

By the Act of 1764, it is declared, " That from and after the passing of this Act, *all* and *every* executor and administrator who shall, before the Ordinary of this province for the time being, or such person as he shall depute or appoint, (now the Inferior Court sitting as a Court of Ordinary,) qualify him, her or themselves for the administration of the estate of his, her or their testator or intestate, shall, upon oath, (the Act provides, then, for the production of the property, appraisement, and making a return to the Ordinary, and then proceeds,) together with a full and perfect inventory of all and singular, the rights and credits of the said testator or intestate, whether the same be in ready money, judgments, bonds or other specialties, or notes of hand, together with a list or schedule of the books of account of such testator." *Prince*, 222.   By this law, the exhibition of the inventory is made the duty of *each and every executor who shall qualify*.   All who qualify are bound by the law to return the inventory—there is no choice about it—and if one of two or more fails to make the return, he violates the law.   In obedience to common sense and common reason, the usage is, as in this case, to make it jointly. The same thing is re-enacted by the Act of 1792.   By this latter Act, the oath of the executor is prescribed, and he is required to swear, that he will make a true and perfect inventory of the goods and chattels of the estate.   *Goods* and *chattels*, in the sense in which these words are used in this oath, I have no doubt, include

*choses in action.* Thus, it is clear that all the executors who qual- ify, must join in returning an inventory. It is, therefore, clear, that so joining is not a voluntary act, and equally clear that there is, upon principle, a wide difference—indeed, no analogy—be- tween a joint inventory and a joint receipt. The plaintiffs' case, of consequence, can derive no strength from the rule that holds co-executors equally liable upon a joint receipt.

As to the liability of co-executors upon a joint receipt, a dis- tinction has been made between creditors and legatees, to the effect that they are liable to the former, but not to the latter. See 2 *Fonblanque's Eq. p.* 437, '38, 4*th Am. edit. Gibbs vs. Hen- ing, Prec. in Ch.* 49. *Brice vs. Stokes,* 11 *Vesey,* 324. *Lord Shipbrook vs. Hinchinbrook,* 16 *Vesey,* 480. *Appeal of Brown's Exrs.* 1 *Dall.* 310.

The reason assigned for it is, that legatees are appointed by the testator, as well as executors, and cannot, therefore, impose the same responsibility on the executors as creditors. For my- self, I see no good reason for the distinction. Lord *Thurlow,* in *Sadler vs. Hobbs,* calls it *an odd distinction.* That creditors have claims upon *the estate,* paramount to those of legatees, is true. No man can give any thing away until his debts are paid. Jus- tice precedes generosity; and it is true, that legatees are *the* ap- pointed beneficiaries of the testator, whilst creditors are rightful demandants under the law. The law protects the rights of cred- itors in the estate of their debtor; but how do these things affect the personal *responsibility* of the executor, or vary the character of his trust? The great equitable principle is, that the executor is to be responsible upon his acts, and according *to the assets that* come into his possession. The law declares the trust to be seve- ral—each has absolute power over the estate. How can these principles be dispensed with *at all,* so as to charge one for assets which his colleague has received? and if dispensed with in favor of creditors, why not in favor of legatees? It seems to me, that in a Court of Chancery, creditors and legatees, as to the personal liability of co-executors upon a joint receipt, stand upon the same platform. This distinction was not recognized by Chancel- lor *Kent,* in *Monell vs. Monell,* (5 *J. C. R.* 283,) and was ex- pressly repudiated in South Carolina, in *Johnson vs. Johnson,* 2 *Hill's C. R.* 293.

If it be true, that a joint inventory will, of itself, charge both

executors, then in every instance any qualified executor becomes surety for his co-executor. The Statute requires all who qualify, to return the inventory—each must, by the mandate of the law, and by the moral constraint of his oath, exhibit the inventory, and when that is done, he, *ipso facto*, is liable; and there is no escape from this liability, but in a breach of duty as required by law, and a violation of moral obligation, as enjoined by oath.

Upon this view of the subject, what becomes of the right of the testator to select his executors? A solvent executor would not qualify with an insolvent one, however honest, and however high in the confidence of the testator; because, by so doing, he becomes his surety. The result would be, that a testator would lie under a necessity of selecting only such men to execute his will, as he might be assured would be willing to be responsible for each other, or be limited to one executor. He must lose the services of his responsible friend, or of his trusted but irresponsible friend. The impolicy of this doctrine is apparent. It would, also, sweep from the books all the rules, so firmly established, which recognise the several character of executors' trusts, and which define and regulate their respective responsibility.

In *Stearne vs. Mills*, (4 *Barn. & Adol.* 655,) Mr. J. *Parke* speaks directly to this point, thus: "To say, generally, that the mere circumstance of having joined in an inventory, for the purpose of obtaining probate, renders an executor liable, would be going farther than is warranted by any authority."

In *Ochiltree vs. Wright*, one of the questions made was, whether one executor, consenting to a sale of property by his co-executor, and joining with him in signing an account and inventory of the sale, was liable for the *devastavit* of his co-executor. The Supreme Court of North Carolina held, that he was not liable under the circumstances of that case, and affirmed several of the propositions which I have stated relative to the legal character and effect of an inventory. *Daniel*, J. delivering the opinion of the Court, says: "The foregoing remarks, bring us to the inquiry whether, under the circumstances of this case, Wright, by his assent to the sale, and signing the inventory and account of sales, has made himself liable for that *devastavit*. The signing of the inventory could not have that effect, because executors are bound to render an inventory of all the assets which

come to their possession or knowledge, because each has authority, by the will, to take possession of the property, and because Beck had already exercised that authority before the inventory was signed. It was but a formal proceeding, and by no means subjects Wright to the *devastavit* of his co-executor. Is there any additional responsibility thrown upon Wright by his assent to the sale by his co-executor, and signing the account of sales with him, to be returned to the County Court?" &c. 1 *Dev. & Bat. Eq.* 339, 340.

Our conclusion is, that the joint inventory of the *choses in action*, is a requirement of the law, obligatory upon both executors; that its office is to exhibit to the Ordinary the *choses in action* which belong to the estate, for the benefit of all parties in interest; that of itself it does not show assets in the hands of either of the executors, so as to charge them, without more. Nor does it prove a joint possession of the evidences of debt due to the testator, but leaves the actual possession in the one or the other, or in both, open to proof.

[6.] Having settled these principles, the application of them to the case is easy. The actual possession of the notes included in this inventory, upon which the arbitrators made Kenan liable, is conceded in the bill to have been proven to have been in Kenan, continuously from the return of the inventory to the making of the award. They were produced to the arbitrators by Kenan, as having been in his possession from the time when the inventory was returned. The answer of Kenan confirms these facts, and the answer of Carter and his returns deny that he ever had possession of them. The evidence farther is, that with proper care and diligence, these papers were collectable. There is no evidence that Carter, by any act of his, put these papers into the possession of Kenan, or contributed to his neglect in not collecting them. How stands the case, then? It is the case of a *devastavit* by negligence, committed by Kenan, in not collecting in *choses in action* which came to his hands, without participation or collusion on the part of his co-executor, Carter, and for which, according to well settled principles, he alone is liable. Such is our judgment, and the judgment of the Court below stands affirmed.

Respect, however, for the counsel who so ably advocated the cause of the plaintiffs in error, as well as the importance of the principles involved in other positions taken by him, make it the

duty of the Court to consider them.   He draws a distinction be-
tween a positive *devastavit,* as where the money has been collect-
ed and converted to the use of the executor, and a negative *de-
vastavit,* as where it consists, as in this case, in negligence and a
failure to collect, and says, that " Where two or more executors
qualify, and the *choses in action* belonging to the estate are lost by
negligence and failure to collect, the executors are all jointly re-
sponsible for the amount so lost."   A failure to collect in the mo-
ney of an estate is a *devastavit,* if, by reasonable diligence, it can
be collected.   If this be true, and the farther proposition be true,
that one executor is not liable, as a general rule, for the *devastavit*
of his co-executor, it would seem to follow, that the position of
the counsel cannot be a sound one.   It does not seem to me, that
upon the principles upon which each executor is made solely lia-
ble for his own *devastavit,* that the manner in which it occurs,
whether negatively or positively, can make a difference.   Having
the power and right to take the assets in hand, irrespective of any
power or right in his colleague, his liability is based upon his
possession, and his act in the one case, and his possession and his
omission of duty in the other.   In either case, there is a breach of
the confidence reposed in him by the testator, and the testator
having misplaced his confidence in one, shall not operate to the
prejudice of the other; that a failure to collect *choses in action*
from negligence, which are collectable, is a *devastavit.   See* 1
*Madd.* 298.   12 *Mod.* 573.   2 *Bro. Ch. C.* 156.   5 *Vesey,* 839.
11 *Wend.* 361.   *Williams on Executors,* 1284.

If there is an agreement between executors, that each shall re-
ceive a certain portion of assets, and administer them, and they
are lost, both have been held liable.   Such a case would fall with-
in the exception to the general rule.   The *agreement* would be
that kind of action on the part of the one, which would make him
a participant in the *devastavit* of the other.   5 *Johns. Ch. R.* 294.
*Ram on Legal Assets,* 542, '4, 558.   2 *Williams' Executors,* 1119.
2 *Hill's Ch. R.* 277.   *Hardres,* 314.   And as to such a case, the
doctrine of the counsel would be true.   But this is not such a
case ; for the record furnishes no evidence that there was any un-
derstanding or agreement to the effect stated.

Or, if it were agreed that the possession and control of the as-
sets should be joint, the liability would be joint.   If, for example,
it were proven that two executors had placed the assets in a com-

mon depository, to which each should have equal access, and both should permit them to lie there until lost, both, I am satisfied, would be liable. But the evidence does not make that case. There is no proof of an agreement that the possession and control of these notes, and other choses, should be joint. Whilst it was admitted in the argument, that they did not come into the actual possession of Carter, it was contended that he had the control over them. The idea that he had the control, is conjectural—it is derived from the fact of a joint inventory. *That,* I have disposed of, from the fact that Carter does not, in his answer, deny that he had the control over them, and that he could have commanded the possession. But he does deny the possession, and states that the possession was in Kenan. In this denial and statement, he must be held to have denied control. As a joint control is not proven, the control must have been in the one or the other. The natural and the legal inference is, that the control accompanied the possession. Kenan had the possession; therefore, Kenan had the control. Or again, which is the most reasonable and the most logical to infer, that Kenan had the control, with the possession; or to infer that Carter had the control, without the possession? The former, clearly. It is argued, that as Carter did receive from Kenan some of the assets named in the schedule, he might have received, he had power to receive, those that were lost, and therefore, he is chargeable. Is not this a *nonsequitur?* What he did get from Kenan, we must infer, he got by his (Kenan's) consent. The delivery of some of the papers embraced in the inventory, by Kenan, to Carter, was voluntary. Does it follow that he would have consented, at Carter's instance, to deliver more or all? As it was at Kenan's option to deliver to Carter any at all, we conclude that those he did not deliver, he did not choose to deliver, and therefore, Carter did not get them. Legally, we infer that Kenan did withhold them from Carter, because it is true in law, that having possession, he would have become liable with Carter, if he had delivered them to him, and they had been lost. As to those that he did deliver to Carter, he is with him responsible. We cannot consent to charge Carter upon inferences like these. The proposition, then, of the counsel, must be considered as applicable to a case where choses in action have come to the possession of one of two executors. If it is true as to this case, one of two things is true in law: Either,

1st. Carter had the power, by virtue of his trust, under the will, to prevent Kenan from taking possession of these assets in the first instance, or

2dly. He had the power to call him to account, and to take the possession and control out of his hands, after he had taken the possession. If he had either of these powers, I concede that it was his duty, under the will, to exert them, to prevent a waste of the estate and a loss to the legatees ; and failing to do so, he is chargeable. I apprehend that neither of these propositions is true. As before stated, the power of the executors over the assets is equal. That power has no regard to the solvency or insolvency of the executor, to his ability to manage them, or to his integrity as a man. It springs out of the will—it is by virtue of the confidence which the testator reposes in him. If he chooses to trust him, it is immaterial whether he has misplaced his confidence or not. If he be, in fact, unworthy of confidence, his co-executor is not necessarily to suffer. He is not compelled to qualify—he may disclaim. And if he does not, he is still safe, if he gives no aid or co-operation to a breach of the trust. The great equitable rule, that each is liable only for his acts, protects him. How, then, is it possible for him, consistently with these principles, to say to his colleague, you shall not take in hand these assets ? If he can prevent him from taking into his possession a part, he can all ; and thus it results, that one executor can defeat, altogether, all the powers of his associate—nullify his appointment, under the will, and prevent the confidence which the testator may rightfully repose. In *Douglass vs. Satterlee, Kent*, Ch. J. says, " It is also equally well settled, that each executor has the control of the estate, and may release, pay or transfer, without the agency of the other, and that executors and administrators stand on the same ground, and their powers and responsibilities in respect to each other are the same." 11 *Johns. R.* 16. *See, also, Edmonds et al. vs. Crenshaw*, 14 *Peters*, 169. *Jacomb vs. Harwood*, 2 *Ves.* 267.

The Master of the Rolls, in *Langford vs. Gascoyne*, says, " The rule in all cases is, that if an executor does any act by which money gets into the possession of another executor, the former is equally answerable with the other, *not where an executor is merely passive by not obstructing the other in receiving it.*" 11 *Vesey*, 333. *Southerland vs. Brush, 7 Johns. Ch. R.* 22. *Harg-*

*thorpe vs. Melforth, Crow. Eliz.* 318. *Harvey vs. Blakeman,* 4 *Vesey,* 596.

In *Williams vs. Maitland,* Judge *Gaston* says, "One has as much authority to receive the assets as the other, and there is no obligation on either to prevent his companion from getting them into possession." 1 *Iredell's Eq. R.* 106.

If these things are so generally, with what irresistible force do they not apply to a case like the present, where there is nothing in the evidence to show that when Kenan took possession of these *choses in action,* he was not trustworthy—nothing proven which was calculated to arouse the suspicions of Carter, that he would waste them or fail to collect them?

The same principles and the same reasonings deny to Carter the power to call Kenan to account, and to take these assets out of his hands after he acquired possession. It does not appear from the record, that he *knew* of Kenan's neglect. He denies that he knew any thing of his management of the estate, except what he learned from his returns. It is argued that he might have known, if he himself was in the proper discharge of his own duties; but it does not follow that a discharge of his duties, as required by the law, would make him cognizant of the defaults of his colleague. But suppose he was, however: it may be true, that it was a moral obligation to do all he could do to prevent a loss to the legatees, yet the law does not make him the supervisor of the conduct of his co-executor. It has not clothed him with power to compel him to do his duty. He cannot call him to account; and if he cannot, how iniquitous would it not be to hold him responsible, because he does not call him to account? The Supreme Court of the United States, in *Edmonds et al. vs. Crenshaw,* say, "Each executor has a right to receive the debts due to the estate, and discharge the debtors, *but this rule does not apply as between the executors. They stand upon equal ground, having equal rights, and the same responsibilities. They are not liable to each other, but each is liable to the cestui que trust, to the full extent of the funds he receives.*" 14 *Peters,* 169.

Precisely the same point was made in the case of *Ochiltree vs. Wright,* before the Supreme Court of North Carolina, in regard to which that Court speaks as follows: "The true answer to this position may be given, almost in the words in which the opinion of this Court was expressed in the case of *Clarke et al. vs. Cot-*

*ton et al.* (2 *Dev. Eq. R.* 51.) Wright was, indeed, a curator or trustee for the plaintiff, but only for what was in his hands, or had been in his hands, or was under his power or control. Beck was a curator or trustee with precisely the same powers. If a misplaced confidence was placed in the latter, it was not the confidence of Wright, but of the testator. Wright did no act by which an abuse of that confidence was facilitated. *He had no authority to take out of Beck's hands the property of the cestui que trust, which was rightfully there;* he never guaranteed the diligence, fidelity or solvency of his co-trustee, and there is no ground, in conscience, to make him answerable, when he has committed no fault and broken no engagement." 1 *Dev. & Bat. Eq. R.* 342.

See the case of *Clark et al. vs. Cotton et al.* (2 *Dev. Eq. R.* 51,) where the same question is considered, and the same views explicitly sustained.

Athough this is the relation which one executor bears to his co-executor—although one cannot prevent assets from going into the hands of the other, and cannot take them out of his hands when there ; yet legatees and distributees are not left to the tender mercies of a faithless or neglectful trustee. The law intervenes for their protection. They can go into a Court of Chancery, and there compel him to account, and there receive that protection which the actual condition of the trust may require; and that they may know whether he is acting in good faith, or with proper care and diligence, he is required, by law, to make annual returns of the condition of the estate in his hands, which are open to their inspection. If he does make regular and full returns, they are thereby advised of the condition of the estate; and if he does not, the omission is a warning to them that something is wrong.

Not only so, but the Statutes of Georgia have made the Court of Ordinary the guardian of their interests. The Ordinary is the legally constituted supervisor of executors, administrators and guardians. The Ordinary can call them to account—it is their duty to do it; and they have power to provide for the faithful and efficient execution of their trusts, or revoke them. *Prince,* 232, 249, 245, '6. *Hotchkiss,* 476 *to* 479.